Filed 5/19/26  P. v. Turney CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

| | |
|---|---|
| THE PEOPLE,<br>      Plaintiff and Respondent,<br><br>      v.<br><br>TREVAUN ROMAN TURNEY,<br>      Defendant and Appellant. | C100122<br><br>(Super. Ct. No. CR2022-2970) |

A jury found defendant Trevaun Roman Turney guilty of two counts of first degree murder, found true a multiple murders special circumstance allegation, and found true that defendant had a prior strike conviction and a prior serious felony conviction. The trial court sentenced defendant to two terms of life without the possibility of parole, plus five years on each count for the prior serious felony enhancement.

Defendant appeals, arguing (1) the trial court abused its discretion in admitting evidence of his internet searches, two days before the first victim's murder, concerning necrophilia and "what happens if you have sex with a dead body," and certain expert testimony, (2) the trial court erred in instructing the jury with CALCRIM No. 378 on consciousness of guilt because there was no evidence that he authorized or knew of a threat made by his friend against a preliminary hearing witness, (3) the cumulative effect of these errors prejudiced him as to count 1, and (4) the trial court abused its discretion in refusing to strike his two five-year prior serious felony enhancements.  We will affirm.

1

BACKGROUND

An information charged defendant with the willful, deliberate, and premeditated murders of Maria Aguilera (Pen. Code, § 187, subd. (a); count 1),[1] and Colleen Paolinelli (count 2), and set forth a multiple murders special circumstance allegation. (§ 190.2, subd. (a)(3)). The information alleged defendant had been convicted of a prior strike (§ 667, subds. (c) & (e)(1)), and a prior serious felony that subjected him to a five-year enhancement on each count (§ 667, subd. (a)(1)).

*Trial–The Prosecution*

*Count 1–Maria Aguilera*

Maria Aguilera was 39 years old and unhoused at the time of her death. She had eight children.

In March 2019, R.E.[2] lived in a tent in Sacramento near the American River by a bike trail which led to the "pipe bridge" 30 or 40 yards away. The pipe bridge spanned the American River and connected the bank on the south of the river and the bank on the north, and was used by bicycles and pedestrians. R.E. lived on the south side of the river. Defendant lived nearby in a makeshift tent. Defendant rode a bike for transportation, and he typically wore a beanie, flip flops with socks, and sweats. He always wore the beanie.

On March 8, 2019, at about 7:00 p.m., R.E. was in his tent when he saw defendant with a red canvas wagon covered by a blue tarp. Defendant asked R.E. to watch the wagon for a while. R.E. asked what was in the wagon, defendant pulled the cover back, and R.E. saw "a girl in there just bludgeoned." Defendant told R.E. that he "smashed her head. The bitch wouldn't shut up." He said he crushed her head with a rock. R.E. refused to watch the wagon. Defendant dragged the wagon away and over the pipe

---

[1]     Further undesignated statutory section references are to the Penal Code.

[2]     To protect their privacy, we will refer to the witnesses by their initials. (Cal. Rules of Court, rule 8.90(b)(10).)

bridge. R.E. acknowledged at trial that he had been addicted to methamphetamine, and that he was on drugs when he saw defendant with the body.

The next morning, March 9, 2019, A.J., who was homeless and living in a tent by the side of a bike trail near the north bank of the American River, was at her camp when someone told her that they had seen a body in a wagon at a nearby camp. Meanwhile, in a nearby camp, G.G. woke up and observed what looked like a red suitcase that he had never seen before. A.J. approached the red "cloth-type wagon," and used a stick to pull away a blanket that was covering it, revealing a woman's body in the fetal position with wounds all over her body. When A.J. announced that there was a body in the wagon, G.G. collected his possessions and relocated.

At around noon on March 9, 2019, Sacramento County Park Ranger Mark Bardosh was crossing the pipe bridge traveling north when A.J. flagged him down and told him, "Ranger, I have a body for you. There's a body." Upon the arrival of additional rangers, A.J. directed them to the body. The rangers entered a campsite and observed a small red pull cart covered with a tarp, blanket, or sleeping bag. Bardosh lifted a corner of the covering and observed Aguilera's body in the fetal position, undressed from the waist down.

There were what appeared to be wheel tracks in the nearby grass. According to both Sergeant Michael Severi and Detective Bryan Alonso of the Sacramento Police Department, the tracks were consistent with the cart in which Aguilera was found. Based on the tracks and the absence of blood at the scene, Severi believed that Aguilera had been killed elsewhere.

Law enforcement created a flyer concerning Aguilera's murder. Certain information was deliberately left out of the flyer, including how Aguilera died, and that her body was found in a red canvas wagon covered with a blue sleeping bag.

Detective Alonso interviewed R.E. in July 2019. R.E. told him that defendant brought a body by his tent in a red cloth wagon on a Friday. Aguilera's body was

3

discovered on a Saturday. R.E. specifically described the body being covered with a blanket or sheet, and specifically used the word "bludgeoned." R.E. also told Alonso something about someone named Frisco swinging a machete at him, and about an incident where someone cut up a body on July 4; Alonso was never able to corroborate either claim.

Dr. Jason Tovar performed the autopsy on Aguilera. He observed blunt force trauma injuries on Aguilera's body, including on her arm and legs. She had about nine blunt force injuries to the right side of her face. She was missing a tooth, and other teeth were loose. She also had abrasions and contusions on the left side of her face and head. She sustained a skull fracture on the right side. She sustained injuries to the right and left sides of her brain, as well as impacts to the front and back. The "front of the face was pretty traumatic," and the injuries to her brain were "pretty catastrophic." Tovar testified that it was possible that she sustained the injuries from someone stomping on her head while she was on the ground, and it was also possible she sustained the injuries from someone hitting her with a hard object. He did not observe defensive injuries. Aguilera died as a result of cranial cerebral blunt force injuries. Tovar also performed a sexual assault examination, and he did not see any objective signs of sexual assault. However, sexual assault does not always produce visible injuries or trauma.

Ryan Nickel, a criminalist, testified as a DNA expert. Swabs from Aguilera's right-hand fingernail scraping, the back left corner of the red canvas wagon, and the wagon's handle release buttons all yielded useful DNA samples. Defendant was excluded as a contributor to the fingernail scraping. It was inconclusive whether defendant was a contributor to DNA found on the wagon's handle release buttons. Defendant was included as a possible contributor to the DNA mixture from the corner of the wagon. It was at least two billion times more likely that defendant and another random individual were contributors rather than two random individuals.

Nickel also analyzed sperm cells from swabs taken from Aguilera's sexual assault kit. Defendant was included as a potential contributor to DNA obtained from sperm fractions from the vaginal, rectal, and anal swabs. For the mixture from the vaginal swab, it was at least two times 10 to the 10th power times more likely that Aguilera and defendant were contributors rather than Aguilera and a random individual. It was at least three times 10 to the 30th power times more likely that Aguilera and defendant were contributors to the mixture from the rectal swab than Aguilera and a random individual. And it was at least seven times 10 to the 30th power times more likely that Aguilera and defendant were contributors to the mixture from the anal swab than Aguilera and a random individual.

Nickel also compared a DNA sample from G.G., whose camp was near where Aguilera's body was found, to all of the samples. It was inconclusive whether G.G. was a potential contributor to a nonsperm fraction from the vulva swab. G.G. was excluded as to all other samples.

Although R.E. identified defendant to law enforcement in July 2019, he did so by first name and did not know defendant's last name. Law enforcement did not immediately identify defendant, and he remained at large.

*Count 2–Colleen Paolinelli*

As of January 2021, Colleen Paolinelli was unhoused and had been staying at a bus stop near a supermarket in West Sacramento for several months. The last time she could be seen alive and moving on surveillance video was at approximately 7:15 p.m. on January 18, 2021.

A cashier at the supermarket testified that, at approximately 6:00 or 7:00 p.m. on January 18, 2021, she observed a man who was going in and out of the store and who was also riding a bike in the parking lot. He wore a dark blue or black hoodie and red pants.

5

Very early the next morning, between 2:00 and 3:30 a.m. on January 19, 2021, M.D. was walking his dog through the supermarket parking lot when he saw a man on a bike wearing a hoodie with red pants.

A supermarket employee arrived at work at approximately 4:49 a.m. When he arrived in the parking lot, he saw a person standing very close to the woman who had been living at the bus stop; she was lying on the ground. The person standing near the woman had a beanie or a hoodie on.

At approximately 11:00 a.m., an employee of the City of West Sacramento Parks Department found a large cardboard box in the supermarket parking lot near a bus stop and placed it in his truck. He also noted a person lying on the ground covered by a tarp or sleeping bag. When he placed the box in a trash enclosure at the corporation yard, he noticed a lot of "red stuff" on it which he thought could be blood.

At approximately 12:36 p.m., West Sacramento Police Officers Francisco Lopez and Jonas Eriemo responded to a bus stop. There, Lopez saw a mound of clothes that appeared to be covering a body, which he recognized as Paolinelli. He also saw blood, and there was a trail of dried footprints that appeared to be in blood leading away from Paolinelli's body.

A firefighter paramedic removed blankets covering Paolinelli and saw a pool of blood. Paolinelli was facedown, and so he rolled her over and confirmed that she was dead. She was not wearing pants or underwear. Her underwear was by her feet. There was a brown sticky substance on her lower back consistent with soda, an empty soda can near her feet, and another in her bag.

Having learned of police activity near the supermarket, the City of West Sacramento Parks Department employee realized that, because it was very windy, the box he had collected may have blown from the bus stop to where he found it. He contacted police, and a crime scene investigator recovered the box.

6

The prosecution played extensive video surveillance footage from the supermarket and other nearby establishments recorded on January 18 and 19, 2021.  Detective Samuel Gee and Detective Nvard Avagyan interviewed defendant and testified that he was shown still photos and video of a person on a bicycle from one of the videos, and defendant acknowledged that it was he who appeared in the video.  Defendant never denied that it was him on the video.  On appeal, defendant does not maintain that he is not the person who appears on these surveillance videos.  In the videos, defendant was wearing a gray hoodie, a red beanie, red pants with a stripe on each leg, and black shoes.

Starting at approximately 5:30 p.m. on January 18 and continuing into the morning of January 19, defendant rode his bicycle to the bus stop by the supermarket, where Paolinelli was found dead, and stopped there 25 times.  He spent a cumulative total of 56 minutes at the bus stop.  In all of the video Detective Gee reviewed, no one else stopped at the bus stop, although some people did walk by.  A paralegal for the Yolo County District Attorney's Office also testified that, in all of the video she viewed, she never saw anyone other than the man on the bicycle stop at the bus stop.

At 1:43 a.m. on January 19, defendant stopped at the bus stop and remained there for an extended period of time.  At one point, a street sweeper's headlights illuminated the bus stop and defendant left.  Around 1:57 a.m., he returned and passed by the bus stop several times.  At 1:58 a.m., he stood with his bicycle at the intersection south of the bus stop, with his body and head facing the bus stop.

At 2:06 a.m., defendant rode by the bus stop, turned around, and stopped.  "Once he's stopped there, he's at the portion of the bus stop where Ms. Paolinelli's body was located the next morning.  Based on the video … you can see his arms were raised above his head…."  His "arms were above his head and there appeared to be a chopping downward motion towards the area where Ms. Paolinelli was located the next morning, and then [defendant] immediately flees southbound…."  At 2:20 a.m., defendant

7

continued "circulating that area where the bus stop is, and … he had spent a couple of minutes there where he is located now at the bus stop, stopped there."

At 2:23 a.m., defendant was again at the bus stop. "There were ... what appeared to be three separate downward chopping motions … based on what I would say is his arms in the video on the way that he was postured." Defendant left the bus stop at approximately 2:26 a.m., "circulated or hovered around the area, made that lap, … and returned to the bus stop now a couple of minutes later."

At approximately 2:33 a.m., defendant could be seen at the bus stop bent over and reaching downward. "And then… it was more circulating the area and … made another stop for an extended period of time before … riding away." At 2:42 a.m., defendant was near an intersection with two vehicles in the area. Defendant "continued through that intersection, and once the traffic appeared to be clear and the bus stop wasn't illuminated by the headlights,… about a minute later," defendant rode his bicycle directly back to the bus stop. Around 2:53 and 3:03 a.m., defendant continued "hovering and circulating the area where the bus stop is." At 3:13 a.m., he rode his bicycle away from the bus stop and then returned to the bus stop a minute or two later.

At 3:16 a.m., defendant returned to the area on his bicycle carrying what appeared to be a large cardboard box. At 3:21 a.m., he took the cardboard box to the bus stop and, when he left, he did not have the cardboard box with him.

Defendant continued to circle the area at 3:23 a.m. At 3:37 a.m., an individual, M.D., could be seen walking his dog. Defendant in his interview stated that he remembered seeing someone walking his dog that morning.

At 3:51 a.m., defendant could be seen at the bus stop manipulating what appeared to be the cardboard box. He continued to hover and circulate in the area at 3:58 and 4:03 a.m. When he departed, he was carrying a 12-pack of soda. Defendant in his interview repeatedly acknowledged stealing the soda when he was at the bus stop.

8

Defendant continued coming and going from the bus stop and the nearby area as of 4:46, 4:58, 5:11, and 5:19 a.m. At 5:42 a.m., after being at the bus stop for a few minutes, defendant left, and he was not seen again on the surveillance video in the area of the supermarket and the bus stop.

Based on videos recorded in other locations, defendant next crossed the Sacramento River on the Tower Bridge and proceeded to the Downtown Commons area of Sacramento. A video taken from that area was of higher quality than many of the other videos, and from it law enforcement prepared a bulletin that included a still photo of defendant. M.D. eventually contacted law enforcement and reported that the person in the bulletin was the person he saw when he was walking his dog. He was 100 percent certain. In November 2021, the Sacramento Police Department contacted West Sacramento Police Detective Avagyan, lead detective on this case, advising her that the person in the bulletin was defendant.

Defendant in his interview with the detectives repeatedly denied killing Paolinelli.

When the detectives discussed what they characterized as defendant striking Paolinelli in a chopping motion, defendant told them that he was not striking her or chopping her. He first said he was grabbing the soda. He then said he did not know what motion he was making. Then he said he was just lifting his hands up. Later, he said he was pulling his jacket out. Detective Avagyan testified that the motions defendant could be seen making in the video did not look like someone lifting their jacket.

Defendant stated that he saw two people at the bus stop that night, an older woman in a wheelchair and somebody lying down covered up. Defendant also told the detectives that he found a cardboard box and gave it to the woman in the wheelchair. Both detectives testified that they never saw anyone in the surveillance videos hanging out at the bus stop other than Paolinelli, and they never saw anyone at the bus stop in a wheelchair.

9

Defendant stated that he believed he was wearing the same Nike slides during the interview that he could be seen wearing in the videos. Detective Gee testified that a bloody footprint found where Paolinelli was killed was similar to the treads of defendant's slides. Detective Avagyan also testified there were similarities between defendant's slides, slides she photographed at a store, and the shoe tread that left the bloody footprint.

Dr. Tovar also performed the autopsy on Paolinelli. Paolinelli also sustained blunt force trauma injuries, including several to the face. She had a loose tooth, and, during the autopsy, that tooth came out. Among other things, Tovar observed a "patterned type abrasion" with linear, regular marks on her neck. Tovar testified that this abrasion could be consistent with the tread pattern from a shoe, and the injury could be consistent with someone lying on the ground and being stomped on. The majority of Paolinelli's injuries were on the left side of her head. She had a fracture of the left temple, a fracture to the back of her skull on the left, fractures in line with the ear, and orbital plate fractures. Paolinelli died from cranial cerebral blunt force injuries. Tovar did not observe any defensive injuries. Tovar did not observe anything abnormal in the sexual assault examination. Tovar testified that there was no way to know whether someone had sex with a person's body when they were alive versus when they were dead.

Jonathan Sewell, a criminalist testifying as a DNA expert, testified that swabs from Paolinelli's sexual assault kit all tested negative for semen. Comparing defendant's DNA to a swab taken from a soda can found near Paolinelli, "it resulted in a likelihood ratio of 17, which provides limited support for exclusion." Defendant was excluded as a contributor to a DNA mixture found in Paolinelli's left-hand fingernail scraping. As for a DNA mixture found on the handholds of the cardboard box, it was approximately 200,000 times more likely that defendant was a contributor than that he was not, which provided "strong support for inclusion." Additionally, it was approximately 1.5 times 10

10

to the 26th power more likely that blood found on the box was Paolinelli's as opposed to a random individual's.

*The Defense*

Andrea Barnett sent surveillance videos to the FBI in an effort to enhance them. The results were not "much different."

Ranger Bardosh from the Sacramento Regional Parks Department described an occasion when he searched R.E. and found methamphetamine and a pipe, and he issued R.E. a citation.

An investigator for the public defender's office bought size 11 Nike slides of the same model identified by the prosecution and measured the features of the treads. She offered details of her measurements.

Sergeant Joseph Ellis acknowledged leaving out of a narrative summary that, in an interview, R.E. claimed Detective Alonso was "out there buying pussy, man, on the block. Smoking dope with people." Ellis "dismissed" R.E.'s account, believing him to be "mistaken." Additionally, Ellis testified that R.E. said some "outlandish" things, and that he seemed "very paranoid…."

*Stipulations*

The parties stipulated that Aguilera's blood contained amphetamine and methamphetamine, and that Paolinelli's blood did not contain drugs or alcohol.

*Jury Verdicts and Sentencing*

The jury found defendant guilty of first degree murder on both counts, and found true the multiple murders special circumstance allegation. In a bifurcated proceeding, the jury found true the allegations that defendant had been convicted of a prior strike, and that he had been convicted of a prior serious felony.

The trial court denied defendant's *Romero* motion (see *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497), and sentenced him to life without the possibility of

11

parole on each count, plus an additional five years on each count for the section 667, subdivision (a)(1) prior serious felony enhancements.

DISCUSSION

I

*Admission of Internet Searches and Expert Testimony*

A.      *Additional Background*

Stephen Jurgeson, an investigator for the Yolo County District Attorney's Office, reviewed data discovered in a warrant search of defendant's electronic accounts. On March 6, 2019, defendant's account searched, "what happens if you have sex with a dead body." At around the same time, defendant's account visited the Wikipedia entry for "necrophilia," which, according to Jurgeson, is defined as "having a sexual fetish surrounding dead bodies."

The prosecution sought to introduce this evidence under Evidence Code Section 1101, subdivision (b), as relevant to show intent, motive, and common scheme or plan. Defendant opposed the motion, arguing that the evidence was substantially more prejudicial than probative and should be excluded under Evidence Code section 352. He asserted that necrophilia was uniquely shocking and offensive, that there was no evidence that he had sex with Aguilera after her death, and there was no evidence that he had sex with Paolinelli at all.

In argument before the trial court, the prosecutor argued that "there's no evidence as to if the sex happened when Ms. Aguilera was alive or dead. It could have happened either way…. The People believe that it happened after she had been killed." The prosecutor acknowledged there was no evidence of sexual assault as to Paolinelli, but argued that defendant's intent in killing her was so that he could sexually assault her, he just did not get the opportunity. The prosecutor emphasized that both victims were found naked from the waist down.

12

The trial court granted the prosecution's in limine motion, ruling the evidence admissible under Evidence Code section 1101, subdivision (b).

At trial, DNA expert Nickel testified, with regard to a sperm found on Aguilera's anal swab, that he saw "a lot of sperm," and the "literature suggests that after about two days, you don't see sperm. So it's putting it within about a 48-hour time frame." Nickel testified about factors that can affect the potential diminishment in the amount of sperm to be found, including activity, hygienic practices, and bathing. The prosecutor posed a hypothetical question involving circumstances where a man had sex with a woman and killed her, and whether Nickel would expect to find a high volume of sperm because there would be less time for it to degrade and the deceased woman would not move around, so there would be less opportunity for drainage. Nickel testified: "Given those factors, that less opportunity to walk around, less opportunity for drainage, there's going to be a higher concentration of semen present."

B.      *Defendant's Contentions*

Defendant argues that the trial court abused its discretion in admitting evidence of his internet searches, two days before the murder of Aguilera, concerning necrophilia and " 'what happens if you have sex with a dead body,' " and Nickel's testimony concerning the hypothetical posed by the prosecutor. We disagree.

C.      *The Admission of Evidence and Standard of Review*

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

With exceptions not relevant here, "evidence of a person's character or a trait of his or her character … is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) However, nothing in Evidence Code section 1101 "prohibits the admission of evidence that a person committed a crime,

13

civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident….) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

A reviewing court reviews " 'the trial court's rulings on relevance and the admission of evidence under Evidence Code sections 352 and 1101 for abuse of discretion.' " (*People v. Parker* (2022) 13 Cal.5th 1, 39.) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal … is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.)

D.     *Analysis*

The evidence overwhelmingly established that defendant had sex with Aguilera. The likelihood ratios established it was a virtual, if not actual, certainty that it was defendant's sperm found in Aguilera's vaginal, rectal, and anal swabs.

Nickel testified that the "literature suggests that after about two days, you don't see sperm. So it's putting it within about a 48-hour time frame." Nickel also testified that certain factors could diminish the presence of sperm, including activity, bathing, and hygiene. He saw "a lot of sperm" on the sample from Aguilera's anal swab.

Thus, the evidence established that defendant had sex with Aguilera within 48 hours of her death (or within 48 hours of when the swab was collected).

No evidence established that defendant had sex with Aguilera *after* she died. However, no evidence established that he had sex with her *before* she died.

Dr. Tovar's testimony that he observed no indications of sexual assault does nothing to resolve the unanswered question of when defendant had sex with Aguilera. He could have had consensual sex with her before her death, leaving no signs of trauma. Given Tovar's testimony that sexual assault does not always produce trauma, defendant could have committed a sexual assault before Aguilera's death, leaving no signs of

14

trauma. And he could have had sex with Aguilera's body after her death, leaving no signs of trauma.

No evidence established that defendant had sex with Paolinelli. However, both victims were discovered unclothed from the waist down.

Theorizing that defendant had sex with Aguilera after she died and intended to have sex with Paolinelli after she died, the prosecution argued the internet search evidence was relevant under Evidence Code section 1101, subdivision (b) to prove intent, motive, and common scheme or plan. " 'In ascertaining whether evidence of other crimes has a tendency to prove [a] material fact, the court must first determine whether or not the uncharged offense serves " 'logically, naturally, and by reasonable inference' " to establish that fact.' " (*People v. Williams* (2018) 23 Cal.App.5th 396, 419.)

The " 'probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 361-362.) The evidence that defendant was interested in and researched necrophilia two days before killing Aguilera would serve logically, naturally, and by reasonable inference to support the prosecution's theory that defendant was motivated to kill Aguilera and Paolinelli by a desire to have sex with dead bodies. The evidence had a direct logical nexus to the killings under this theory.

Similarly, this evidence would logically, naturally, and by reasonable inference supply his intent in killing the victims under this theory, to satisfy his desire to have sex with dead bodies.

In arguing that the evidence was also relevant to prove a common scheme or plan to kill both victims in order to have sex with them, the People focus on the similarities between the two murders, specifically that both involved unhoused women who were found unclothed from the waist down. This analysis would be more apt to the admission of evidence of one of the murders in attempting to prove the other. "[I]n establishing a

15

common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)  The internet searches concerning necrophilia do not demonstrate a concurrence of common features between them and the murders.

In any event, as stated, the evidence had some tendency in reason to establish intent and motive, and thus was relevant.  (See Evid. Code, §§ 210, 1101, subd. (b).)

Defendant argues that the primary issue in this case was identity, and that issues such as motive and intent were not material.  However, by pleading not guilty, defendant "place[d] all issues in dispute, and thus the perpetrator's identity, intent and motive are all material facts." (*People v. Walker* (2006) 139 Cal.App.4th 782, 796; accord, *People v. Tully* (2012) 54 Cal.4th 952, 1010; see also *People v. Thompson* (1980) 27 Cal.3d 303, 315 ["In order to satisfy the requirement of *materiality*, the fact sought to be proved may be either an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact[] may be presumed or inferred' " (fn. omitted)].)  And given the DNA evidence establishing that defendant had sex with Aguilera, the evidence of his interest in necrophilia could have some relevance in establishing the identity of her killer.

Having concluded the evidence was relevant, we turn to Evidence Code section 352.  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  The " 'prejudice' referred to in Evidence Code section 352 means ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*People v. Schultz* (2020) 10 Cal.5th 623, 670.)

16

The probative value of the evidence was significant. The evidence of defendant's internet searches concerning necrophilia and "what happens if you have sex with a dead body" furnished a potential motive and intent for both murders.

On the other side of the scales, defendant does not argue that the admission of the evidence necessitated undue consumption of time, or that it posed any danger of confusing the issues or misleading the jury. Instead, he focuses on what he deems to be the substantial danger of undue prejudice resulting from the admission of this evidence.

Necrophilia is a taboo subject. (See *Flynn v. Holder* (9th Cir. 2012) 684 F.3d 852, 861 [noting, in a case involving an issue unrelated to any in this case, the "taboos we have against cannibalism, defilement of corpses, and necrophilia"].) A person who "commits an act of sexual penetration on, or has sexual contact with, remains known to be human" is guilty of a felony. (Health & Saf. Code, § 7052, subd. (a).) In short, the evidence that defendant performed research on "what happens if you have sex with a dead body" and necrophilia two days before Aguilera's death had some potential for undue prejudice.

That said, defendant was charged with the brutal murders of two unhoused woman. Numerous cranial cerebral blunt force injuries were inflicted on each of the women. Neither woman showed evidence of having sustained any defensive wounds, suggesting that they were caught unawares when attacked. Each victim was left unclothed from the waist down. In the case of Aguilera, defendant carted her body around in a red canvas wagon and asked an acquaintance to watch the wagon for a while, and then left the body in the wagon at a homeless encampment. Additionally, defendant either had sex with Aguilera within 48 hours before "bludgeon[ing]" her to death, or had sex with her body postmortem. In the case of Paolinelli, defendant could be seen on videos stopping at the bus stop where she was killed no fewer than 25 times over the night of January 18 and the early morning of January 19, 2021, spending a total of 56 minutes there. He began his forays to the bus stop well before he could be seen on

17

surveillance video making downward chopping motions at Paolinelli at the bus stop. And he continued returning to the bus stop and hovering around the area for hours after.

All of this is to say that the evidence that defendant performed two internet searches, specifically for "what happens if you have sex with a dead body" and necrophilia, was not more inflammatory than the charged murders. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 372 [evidence challenged under Evid. Code, § 352 "was not significantly more inflammatory than the charged offenses such that there was a substantial danger that the introduction of this evidence would cause undue prejudice"].) "Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) We conclude that the probative value of the evidence was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice. (Evid. Code, § 352.)

Finally, defendant argues that Nickel's testimony was speculative and based on facts not in evidence. "Use of hypothetical questions is subject to an important requirement. 'Such a hypothetical question must be rooted in facts shown by the evidence…." (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.) At the page of the reporter's transcript defendant cites, Nickel testified, in response to the hypothetical posed by the prosecutor, that if a male had intercourse with a woman and killed her, because the victim would be deceased, "[g]iven those factors, that less opportunity to walk around, less opportunity for drainage, there's going to be a higher concentration of semen present." The facts shown by the evidence included that semen was found in Aguilera, she was dead, and, according to Nickel's testimony, the semen was deposited within 48 hours of her death (or when the swab was collected), not necessarily limited to prior to death. Nickel's testimony was rooted in facts shown by the evidence.

18

## II
### Instructional Error

A.    *Additional Background*

On November 15, 2022, R.E. testified at the preliminary hearing and defendant was present.  Subsequently, R.E. was riding his bike when he saw D.C., a friend of defendant's, and D.C. said to R.E., "Hey, you fucking snitch bitch," or something similar. Later, when R.E. went to his tent, his possessions were strewn all about, and his friend told him that D.C. had just left.

K.K. testified that, on November 30, 2022, D.C. came to the campsite looking for R.E.  Referring to R.E., D.C. said, "He's telling."  K.K. did not see anyone disturb R.E.'s campsite.

D.C. testified that he knew both defendant and R.E.  He denied calling R.E. a "snitch bitch" and denied seeing R.E. that day.

B.    *The Trial Court's Instruction and Defendant's Arguments*

Over defendant's objection, the trial court instructed the jury with a tailored version of CALCRIM No. 378:  "If the defendant had someone threaten a witness, that conduct may show that he was aware of his guilt.  If you conclude that the defendant had someone threaten a witness or tried to have someone threaten a witness, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant had someone threaten a witness or tried to threaten a witness cannot prove guilt by itself."

Defendant argues that the trial court erred in instructing the jury with CALCRIM No. 378 on consciousness of guilt because there was no evidence that he authorized or knew of any threat made by D.C.  He argues that the error was prejudicial as to count 1. We agree the instruction was error but conclude it was harmless.

19

C.    *Error*

A jury instruction must be supported by substantial evidence.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)  Substantial evidence "is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201 fn. 8.)  An appellate court reviews the trial court's decision to give a jury instruction de novo.  (*Cole*, at p. 1206.)

There was evidence that D.C. knew both defendant and R.E., and that he threatened R.E.  However, we find no evidence that defendant had D.C. threaten R.E., or that he tried to, so as to be reflective of his consciousness of guilt and to support CALCRIM No. 378 as given here.  (See *People v. Valdez* (2012) 55 Cal.4th 82, 135, fn. 32 ["Evidence of efforts to intimidate a witness is … admissible to show a defendant's consciousness of guilt if there is evidence the defendant authorized or acquiesced in the efforts"]; see also *People v. Hannon* (1977) 19 Cal.3d 588, 600 ["the admission of evidence purporting to show suppression or attempted suppression of evidence is erroneous absent the prerequisite of proof that the defendant was present at such an incident or proof of authorization of such illegal conduct"].)

The People argue that substantial evidence supported the instruction because defendant's girlfriend communicated with defendant every other day, and she knew D.C. These representations are accurate.  The People further claim that, in a jail call, defendant told his girlfriend to tell someone named Ricardo, "don't say good shit" about R.E. to the defense investigator.  At the pages of the reporter's transcript to which the People cite, defendant's girlfriend actually testified that it was not true that defendant told her that. Even if the People's representation was supported by the record, however, this provides nothing beyond speculation to support the premise that defendant *also* told D.C., directly or indirectly, to threaten R.E.  "Speculation is not substantial evidence." (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851.)

D.      *Prejudice*

Defendant argues that the instruction was prejudicial as to count 1 under both the *Chapman* standard for federal constitutional error (see *Chapman v. California* (1967) 386 U.S. 18), and the *Watson* test for state law error (see *People v. Watson* (1956) 46 Cal.2d 818).  We conclude the error was harmless under any standard.

On the evening of March 18, 2019, defendant asked R.E. to watch a red canvas wagon covered by a blue tarp.  R.E. then saw the body of a woman in the wagon who had been bludgeoned.  Defendant told him that he "smashed her head.  The bitch wouldn't shut up," and that he crushed her head with a rock.  When R.E. refused, defendant dragged the wagon away and over the pipe bridge.

The next morning, Aguilera's body was found on the other bank of the American River in a red canvas wagon with a blue covering.  Based on wheel tracks and the lack of blood where Aguilera was found, law enforcement believed she was killed elsewhere.

We note that R.E. had been on drugs when he saw defendant with the body, and he lied at the preliminary hearing when he said he was not using drugs.  Additionally, R.E. recounted for law enforcement other events that were never corroborated, and, to Sergeant Ellis, he said some outlandish things and seemed paranoid.

We also note, however, that when law enforcement created a flyer concerning Aguilera's murder, certain information was deliberately left out, including how she died, and that her body was found in a red canvas wagon covered with a blue sleeping bag.  In his July 2019 account to law enforcement, R.E. specified that the body he saw had been bludgeoned, and that it was in a red cloth wagon covered with a blanket or sheet.  Additionally, he reported that defendant brought the body by his tent on a Friday, and Aguilera's body was discovered on a Saturday.

Aguilera died as a result of cranial cerebral blunt force injuries.  She did not sustain defensive injuries.  Based on the DNA evidence, it was a virtual certainty that it was defendant's semen found in Aguilera's vaginal, rectal, and anal swabs, and that the

21

semen was deposited within 48 hours of Aguilera's death (or within 48 hours of when the swab was collected). Defendant was a possible contributor to DNA found on the corner of the wagon.

Meanwhile, the offending instruction only told the jurors that, if they found that defendant had someone threaten a witness, that may show that he was aware of his guilt; that, if they concluded defendant had someone threaten a witness, or tried to, it was up to them to decide the meaning and importance of that conduct; and that any evidence that defendant had someone threaten a witness, or tried to, could not by itself establish defendant's guilt.

Under *Chapman*, the "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3; *Chapman v. California, supra*, 386 U.S. at p. 24.) We do not agree with defendant's characterization that the evidence against him in the murder of Aguilera "was not strong," and that this was a "close[]" case. On the contrary, we find the evidence of defendant's guilt overwhelming. Having examined the entire cause, and considering all relevant circumstances, we conclude that the error in instructing the jury with the tailored version of CALCRIM No. 378 was harmless beyond a reasonable doubt as to count 1.

### III

### *Cumulative Error*

Defendant argues that the cumulative effect of the evidentiary and instructional errors prejudiced him as to count 1. We have found no prejudice resulting from the instructional error, and we have rejected defendant's claim of evidentiary error. Thus, there is no cumulative effect of multiple errors to consider in the aggregate. We therefore

reject defendant's cumulative error claim.  (See *People v. Vieira* (2005) 35 Cal.4th 264, 305; see also *People v. Richie* (1994) 28 Cal.App.4th 1347, 1364, fn. 6.)

IV

*Prior Serious Felony Conviction Enhancements*

A.      *Additional Background*

Before sentencing, defendant unsuccessfully requested the dismissal of the section 667, subdivision (a)(1) prior serious felony enhancements pursuant to section 1385. Defendant relied on the statutory mitigating circumstances that the current offenses were connected to prior victimization or childhood trauma (§ 1385, subd. (c)(2)(E)), and that the enhancements were based on a prior conviction more than five years old (§ 1385, subd. (c)(2)(H)).  In support of his motion, defendant submitted a social history detailing his life.  As the introduction of the social history put it:  "Abandoned, separated, and neglected, [defendant's] emotional and physical needs were rarely met throughout his entire childhood.  As a result of intense traumas and losses–including the death of his biological father when he was 1 years-old and his mother's arrest for murder when he was 14 years old–[defendant] often had no one but himself to rely on for protection or survival, let alone guidance and support.  His childhood story … is a tragic case of a child falling between the cracks."

The prosecution did not dispute defendant's representations concerning his childhood, or that the current crimes were connected to childhood trauma.  In opposing defendant's motion, the prosecution relied on defendant's prior convictions, juvenile adjudications, arrest history, and the present offenses.  Among other things, in 2003, defendant was in an altercation at school and threatened staff with a chair and a stick.  In April 2010, he was placed in the emergency custody of a county department of human services after he was reported as having behavioral problems and a preoccupation with sexual content.  In October 2010, he was accused of robbing a 13-year-old boy, taking his

23

cell phone, and punching him in the eye. In October 2010, he was arrested for sexual battery for touching a 15-year-old female student's buttocks. In December 2010, he made inappropriate sexual comments to a 15-year-old student, grabbed her, and kissed her over her objections, and he was arrested for sexual battery. In March 2011 he had a juvenile court petition sustained charging grand theft from a person. In the conduct giving rise to his prior serious felony conviction, in 2013, defendant was convicted of robbery for punching a man in the face and snatching a cell phone out of his hand. Interviewed about the crime, defendant purportedly said that he did not have any remorse for the victim and that he would continue to rob people. Defendant received a two-year sentence and, in 2014, violated parole. In January 2018, defendant placed both hands around the neck of a woman he was dating and strangled her with full force for 10 seconds and threw her to the floor. In October 2021, defendant punched his girlfriend in the nose five to six times.

B.    *The Trial Court's Ruling and Defendant's Arguments*

In denying defendant's motion, the trial court stated: "In considering whether the Court should grant the petition to dismiss or stay any of those, the Court considers the relative youth of the defendant. The Court has considered the challenging distressed background of the defendant as far as his family history. The Court has considered his relative lack of convictions as an adult and a juvenile. The Court has also considered the evidence presented by the People which includes descriptions of incidents that may not have resulted in a conviction or an adjudication in juvenile court. The Court also considers the circumstances of the crimes for which the jury found him guilty. [¶] In balancing all of those things, the Court finds it would not be in the furtherance of justice to dismiss or stay any of the enhancements. The motion is denied."

Defendant argues that the trial court abused its discretion in refusing to dismiss the five-year prior conviction enhancements in light of the age of the prior, his traumatic childhood, and because he received two life sentences. We disagree.

24

C.     *Section 1385 and Standard of Review*

Section 1385 provides that, "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).)  In exercising its discretion under section 1385, subdivision (c), "the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present." (*Id*. at, subd. (c)(2).) "Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (*Ibid*.)

Section 1385's language directing courts to "afford great weight" to evidence of mitigating circumstances does not create a rebuttable presumption in favor of dismissal. (*People v. Walker* (2024) 16 Cal.5th 1024, 1028.)  Instead, "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present." (*Id*. at p. 1029.)  The California Supreme Court in *Walker* discussed with approval the formulation in *People v. Ortiz* (2023) 87 Cal.App.5th 1087, that, "absent a finding that dismissal would endanger public safety, a court is required to engage 'in a holistic balancing *with special emphasis* on the [nine] enumerated mitigating factors,' in which those mitigating factors weigh 'strongly in favor of … dismissal.' " (*Walker*, at p. 1029; see also *id*. at pp. 1034, 1036.)  The Supreme Court elaborated:  "if the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in furtherance of justice. This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that

25

'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Id*. at p. 1036.)  The " 'ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement' [citation] and this 'furtherance of justice' [citation] inquiry requires a trial court's ongoing exercise of 'discretion.' " (*Id*. at p. 1033.)

"We review a court's decision to deny a motion to strike a five-year prior serious felony enhancement for an abuse of discretion." (*People v. Shaw* (2020) 56 Cal.App.5th 582, 587.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

D.    *Analysis*

One mitigating circumstance on which defendant relies is that the "current offense is connected to prior victimization or childhood trauma." (§ 1385, subd. (c)(2)(E).)  The trial court expressly considered defendant's difficult childhood, stating that it had "considered the challenging distressed background of the defendant as far as his family history."  Thus, the parties agreed that defendant had a challenging and difficult childhood, and the trial court evidently agreed, as do we.

The other mitigating circumstance on which defendant relies is that the "enhancement is based on a prior conviction that is over five years old." (§ 1385, subd. (c)(2)(H).)  Defendant's prior serious felony conviction was a May 6, 2013, conviction of robbery, and, assuming he murdered Aguilera on March 8, 2019, that prior was five years 10 months old on that date.  (See *People v. O'Bannon* (2024) 105 Cal.App.5th 974, 977 [prior conviction's age is measured from date of prior conviction to date current offense was committed].)

Thus established, the trial court was required to "consider and afford great weight" to these two mitigating circumstances.  (§ 1385, subd. (c)(2).)

26

As stated, the trial court recited that it "considered the challenging distressed background of the defendant as far as his family history," and that it balanced all of the factors it discussed. Defendant argues that the court's "comment that it 'balance[d]' all the mitigating and aggravating factors [citation] suggests it considered them with the same lens, rather than properly affording great weight to the enumerated factors." However, in "the absence of evidence to the contrary, we presume that the [trial] court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

Notwithstanding these two mitigating circumstances, the trial court determined that granting defendant's motion and striking his two five-year prior serious felony enhancements "would not be in the furtherance of justice…."

Defendant has a lengthy history of criminal and violent behavior. Additionally, his present crimes are egregious, involving highly similar murders in which he inflicted numerous and fatal blunt force head injuries on two unhoused women, who, based on the absence of defensive wounds, never had the opportunity to defend themselves. Defendant left his victims unclothed from the waist down, Aguilera crammed into a red canvas wagon and Paolinelli on the ground of a bus stop covered by a cardboard box. While both murders are defendant's "current" crimes, we do note that they took place close to two years apart, after defendant evaded detection for Aguilera's murder.

We cannot conclude that the trial court's determination that granting defendant's motion would not be in furtherance of justice was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra*, 33 Cal.4th at p. 377.)

Defendant suggests that the trial court's determination was an abuse of discretion because it failed to make the "threshold" determination whether "dismissal of the enhancement would endanger public safety" (§ 1385, subd. (c)(2)), and that the court was required to address that question. He raises related arguments about the effect of his life without the possibility of parole sentences on the danger to public safety analysis.

27

However, a court is not required to find that dismissal of an enhancement would endanger public safety to deny dismissal of an enhancement under section 1385, subdivision (c). "[U]ltimately, the court must determine whether dismissal is in furtherance of justice. This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*People v. Walker, supra*, 16 Cal.5th at p. 1036; see also *id*. at p. 1033 [§ 1385, subd. (c)(2), "does not erect a rebuttable presumption in favor of dismissal that can only be overcome by a finding that dismissal endangers public safety"].) "The trial court must find that *any* dismissal under subdivision (c) is in 'furtherance of justice.' [Citation.] The 'endanger public safety' language applies only as an exception to the requirement that the court must give 'great weight' to the presence of any mitigating circumstances. [Citation.] But the controlling 'furtherance of justice' standard is broader and allows the court to consider factors beyond public safety in exercising its discretion whether to dismiss an enhancement, including the nature and circumstances of the crimes and defendant's background, character, and prospects.' " (*People v. Mazur* (2023) 97 Cal.App.5th 438, 446.) In other words, "the court retains discretion under section 1385[, subdivision] (c)(2) to choose not to dismiss the enhancement in the furtherance of justice for reasons other than public safety." (*People v. Ponder* (2023) 96 Cal.App.5th 1042, 1052.) Having found here that dismissal would not be in furtherance of justice, the trial court was not required to undertake a superfluous analysis of whether dismissal would endanger public safety.

28

The trial court did not abuse its discretion in denying defendant's motion.

DISPOSITION

The judgment is affirmed.

\s\
KRAUSE, Acting P. J.

We concur:

\s\
BOULWARE EURIE, J.

\s\
WISEMAN, J.*

---

*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.